IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**SNAPPY SHEDS, INC., MARK BERRY,**
**REGINA BONEY, PHILIP J. MONTOYA,**
**Trustee of the Chapter 7 Bankruptcy Estates of**
**SUNLAND STEEL CORPORATION, KEN**
**and DORIS BERRY, and MARTIN and**
**BRENDA GOMEZ,**

        **Plaintiffs,**

vs.                                                                              No. CIV 03-0947 RB/KBM

**HOME DEPOT, U.S.A., INC.,**

        **Defendant.**

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** is before the Court on Defendant (Home Depot's) Motion for Summary Judgment on the Individual Plaintiffs' Claims (Doc. 40), filed on February 8, 2005. Jurisdiction is founded upon 28 U.S.C. § 1332. Having reviewed the submissions of the parties and the relevant law, I find that this motion should be denied.

**I.**    **Background.**

    Sunland Steel was a welding and fabrication shop located in Truth or Consequences ("T or C"), New Mexico. (Def. Ex. A.) In 1997, Ken Berry, his son, Mark Berry, and his son-in-law, Martin Gomez, borrowed $80,000.00 from Norwest Bank to purchase Sunland Steel. (Undisputed Facts ¶ 10; Def. Ex. A.) Ken Berry, his wife, Doris Berry, Martin Gomez, and his wife, Brenda (formerly Berry) Gomez, personally guaranteed the loan. (Undisputed Facts ¶ 11.) On March 6, 1998, Ken Berry and Martin Gomez incorporated Sunland Steel Corporation ("Sunland"). (Def. Ex.

H.)

Ken Berry obtained a line of credit for Sunland from Norwest, and used personal credit cards and cash to finance the operations of Sunland. (Undisputed Facts ¶ 12.) Prior to its first contact with Home Depot, Sunland was generating enough income to cover its debt and was a profitable company. (Undisputed Facts ¶ 13; Def. Ex. F.)

In 1999, the individual Plaintiffs began to design and build portable metal storage sheds. (Compl. ¶ 9.) In May 1999, Ken Berry and Doris Berry incorporated Snappy Sheds, Inc., ("Snappy Sheds"), to pursue the business of manufacturing and selling the portable sheds. (Undisputed Facts ¶ 66; Compl. ¶10; Def. Ex. H.)  Ken Berry, Doris Berry, Martin Gomez, Brenda Gomez, and Mark Berry, were the directors and owners of Snappy Sheds. (Undisputed Facts ¶ 9.)

In July 2000, some of Sunland's assets were moved to Snappy Sheds' books and some Sunland employees were moved to Snappy Sheds' payroll. (Undisputed Facts ¶ 67.) The portable sheds were manufactured at the Sunland plant by Sunland employees. (Undisputed Facts ¶ 68.) Snappy Sheds shared Sunland's office space. (*Id*.) The only product marketed by Snappy Sheds as of May 2000 was the portable sheds. (*Id*.)

On May 12, 2000, Paul Wyman, Southwest Divisional Installation Manager for Home Depot, and Pat Kenney, another Home Depot manager, toured Sunland's production facilities in T or C. (Def.'s Proposed Undisputed Facts ¶ 69; Pl. Exs. A, B, C; Def. Ex. 1.) Ken Berry, Martin Gomez, and Mark Berry were present for the tour, which lasted about 30 to 40 minutes. (Pl. Exs. A, B, and C; Def. Ex. F.) Ken Berry led the tour and demonstrated the use of equipment to Wyman and Kenney. (*Id*.)

After the tour, Wyman and Kenny met for about one hour with Ken Berry, Doris Berry,

2

Martin Gomez, Brenda Gomez, Mark Berry, and Mark Berry's girlfriend, Regina Boney, in the Sunland/Snappy Sheds office. (Def. Exs. D, E, F, and G; Pl. Ex. 3.) The individual Plaintiffs testified in their depositions that, during the meeting, Wyman represented to them that he had authority to place the sheds in Home Depot stores throughout Home Depot's Southwest Division and cause them to be aggressively and professionally marketed by Home Depot. (Pl. Exs. to Resp. to Mot. to Dismiss A, B, C; Pl. Exs. 1, 2, 3.)

Mark Berry testified in his deposition that Wyman told the individual Defendants that Home Depot would carry the sheds in enough stores to sell as many sheds as they could produce. (Pl. Ex. 1.) Brenda Gomez and Martin Gomez testified that Wyman told them that Home Depot could sell as many sheds as they could build. (Pl. Exs. 2 and 3.) When Martin Gomez informed Wyman that their production capacity was 240 sheds per month, Wyman suggested that the individual Plaintiffs consider building an additional plant in the Dallas-Ft. Worth, Texas area to meet the anticipated demand for the sheds. (Pl. Exs.1, 2, 3, 4.)

Doris Berry testified in her deposition that Wyman told the individual Plaintiffs he was impressed with their family business and excited about their product. (Def. Ex. G; Pl. Ex. 4.) Doris Berry testified that Wyman stated he had never been so excited about a product as he was about the sheds. (Def. Ex. G; Pl. Exs. 2 and 4.)

Doris Berry and Brenda Gomez testified in their depositions that Wyman told them that he was so excited about the sheds that he had "goosebumps" and that the individual Plaintiffs would be "millionaires" by the following year. (Def. Ex. G; Pl. Exs. 2 and 4.) Doris Berry testified in her deposition that Wyman told the individual Plaintiffs that Home Depot would initially carry the sheds in ten stores, then expand to all stores in the Southwest Division, and eventually sell the sheds

3

nationwide. (Pl. Ex. 4.)

Martin Gomez testified in his deposition that Wyman told them "the nation was [theirs]" so long as they were able to supply enough sheds. (Pl. Ex. 3.) Doris Berry testified in her deposition that Wyman told the individual Plaintiffs that Home Depot would terminate its relationship with them if they were unable to supply a sufficient number of sheds to satisfy demand. (Pl. Ex. 4.) Throughout the May 12, 2000 meeting, the individual Plaintiffs believed that Wyman was talking to them, not only as part of the family-owned business, but also as individuals. (Pl. Exs. A, B, C, 1, 2, 3, 4.)

Ken Berry and Martin Gomez stated in affidavits that they and their spouses personally relied on Wyman's representations to their detriment in that they used personal credit cards and personally guaranteed corporate debts. (Pl. Exs. A and B.) Mark Berry averred that he and Regina Boney relied on Mr. Wyman's representations to their detriment in that they moved from T or C to Dallas, used his motorcycle as a down payment on a trailer, and worked for little or no compensation. (Pl. Ex. C.)

Ken and Doris Berry testified in their depositions that they expended more than $100,000.00 in personal funds and personal credit card charges to make equipment lease payments, buy materials, and pay travel expenses for the business. (Def. Ex. F; Pl. Ex. 4.)

Wyman stated in his affidavit that he believed that Mark Berry represented the corporate entity that manufactured the sheds. (Wyman Aff.) At the May 12, 2000 meeting, Wyman was introduced to individuals whom he believed were owners or agents of Sunland, but focused his attention on Mark Berry. (*Id.*) Wyman was not informed that the individuals were present in their individual capacities. (*Id.*) None of the individuals expressed a desire to obtain any direct advantage or benefit for themselves, individually, from Home Depot, as opposed to obtaining a potentially

4

indirect benefit through Sunland's entry into the contractual relationship with Home Depot. (*Id*.)

Plaintiffs increased production capabilities in reliance on the representations of Home Depot. (Compl. ¶ 20.) When sales in Home Depot stores in West Texas and New Mexico failed to approach production capacity, Plaintiffs asked Home Depot to carry the sheds in additional stores. (Compl. ¶ 22.) In 2001, Home Depot began carrying the sheds in additional stores in Texas. (Compl. ¶ 23.) Sales continued to lag behind expectations and on July 27, 2001, Plaintiffs advised Home Depot in writing that they could no longer supply the sheds. (Compl. ¶ 27.) In late 2001 and early 2002, Ken and Doris Berry, Martin and Brenda Gomez, and Sunland filed bankruptcy petitions. (Compl. ¶¶ 28-30.)

On July 23, 2003, Plaintiffs filed a complaint in the First Judicial District, County of Santa Fe, State of New Mexico, alleging fraud, violation of the New Mexico Unfair Practices Act (NMUPA), and violation of the Texas Deceptive Trade Practices Act (TDTPA). On August 14, 2003, Defendant removed the matter to this court, pursuant to 28 U.S.C. § 1441(a).

On May 26, 2004, Home Depot's motion to dismiss or for summary judgment was granted as to the TDTPA claim, and denied as to the individual Plaintiffs' claims, the fraud claims, and the NMUPA claims. On November 16, 2004, Plaintiffs' motion to reconsider the dismissal or the TDTPA claims was denied. In the instant motion, Home Depot argues that it is entitled to summary judgment on the individual Plaintiffs' claims because they did not suffer injuries separate from the alleged injury to the corporations.

**II.  Summary Judgment Standard.**

A motion for summary judgment may be granted only when "there is no genuine issue as to

5

any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id*.

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

**III. Discussion.**

In a diversity case, the federal court must apply the law of the forum state to all substantive issues. *Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc.*, 24 F.3d 125, 128 (10th Cir. 1994). Therefore, the court must look to New Mexico substantive law to determine whether the individual Plaintiffs suffered separate and distinct injuries.

As a general rule, New Mexico law provides that a corporation and a shareholder are separate

entities, and a shareholder of a corporation does not have an individual right of action against a third party for damages that result because of an injury to the corporation. *Marchman v. NCNB Texas Nat. Bank*, 120 N.M. 74, 81, 898 P.2d 709, 716 (1995).

The two exceptions to this general rule are (1) where there is a special duty between the wrongdoer and the shareholder, or (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders. *Marchman*, 120 N.M. at 82, 898 P.2d at 717. The individual Plaintiffs contend that they fall within the separate and distinct injury exception.[1] In order to satisfy this exception, the individual must establish that he or she suffered a direct injury in his or her individual capacity, independent of any duty to the corporation. *Id*.

The individual Plaintiffs have submitted evidence indicating that they suffered direct injuries to themselves as individuals, separate from the alleged injury sustained by Sunland. Ken Berry, Doris Berry, Martin Gomez, Brenda Gomez, Mark Berry, and Regina Boney testified in their depositions that Wyman directed his statements to them as individuals during the May 12, 2000 meeting. The individual Plaintiffs testified that they expended personal funds, incurred personal debts, and worked for little or no compensation in reliance on Wyman's representations. Construed in the light most favorable to Plaintiffs, this evidence could establish that the individual Plaintiffs suffered direct injuries in their individual capacities. Viewed in the light most favorable to the individual Plaintiffs, the record is sufficient to create disputed issues of material fact. For this reason, summary judgment on the individual claims is inappropriate. FED. R. CIV. P. 56(c).

---

[1] Home Depot's reliance on *Delta Automatic Systems, Inc. v. Bingham*, 126 N.M. 717, 974 P.2d 1174 (Ct. App. 1998) is inapposite because that case addressed the special duty exception and not the separate and distinct injury exception.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on the Individual Plaintiffs' Claims (Doc. 40), filed on February 8, 2005, is **DENIED**.

*/s/ Robert Brack*

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**